When the Honorable U.S. Court of Appeals for the First Circuit is now in session, all persons having any business before this Honorable Court may give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The case today is Students for Fair Admissions, Inc. v. President & Fellows of Harvard, Appeal No. 192005. Good afternoon, counsel. I'm Chief Judge Howard and with me this afternoon are Judge Torguea and Judge Lynch. Mr. Consovoy, you may begin when you're ready. Thank you, Your Honor. Good afternoon and may it please the Court, William Consovoy on behalf of Appellant Students for Fair Admissions. With the Court's permission, I'd ask to reserve five minutes for rebuttal. Yes. Thank you, Your Honor. The central issue in this appeal, as it has been from the beginning of this case, is whether Harvard discriminates against Asian American applicants by, and among other ways, imposing a penalty on them in the highly subjective personal rating. After nearly six years of litigation and a lengthy trial, the District Court was unable to confidently determine that Harvard treats Asian American applicants fairly. In fact, the Court found probative and credible evidence of a statistically significant penalty in the personal score and ultimately concluded that these discrepancies could not be fully and satisfactorily explained. Judgment should have been rendered against Harvard for this reason alone. After all, one of the chief purposes of strict scrutiny is to ensure that racial stereotyping and other forms of illicit bias do not infiltrate a system of racial preferences. Harvard was unable to carry that heavy burden in this case. But Harvard's system violates strict scrutiny for other reasons as well. Counsel, just before you get there, on the We should conclude that your clients carry the burden. Your clients have the burden on that count. Have you preserved an argument that you have carried that burden? Or has that been abandoned? It has not been abandoned, Your Honor. We do preserve that argument. We believe the same evidence that defeats Harvard under strict scrutiny would carry our burden. In a case where statistics are the chief issue in dispute, once an inference of discrimination is created, even in cases where the plaintiff carries the burden throughout, the burden does then switch. This happens in Title VII cases all the time. And Harvard would still have to disprove that those statistics don't create an inference of discrimination. So we think we prevail in either case. May I follow up, please? If the district court were correct that intentional discrimination has not been shown, what does it mean to apply strict scrutiny in the absence of any intentional discrimination? So, Your Honor, we think that when we talk about intentional discrimination here, what we're talking about is evidence of racial stereotyping, no different than the kind of evidence that Your Honor's opinion laid out in the Thompson v. Eastman Kodak case. The district court did find there was evidence of this, particularly in the personal rating. Okay. So this argument is independent of the statistical argument. Is that correct? That is not correct, Your Honor. There is evidence both of a statistical nature and non-statistical. All right. The district court found against you on the non-statistical evidence. And as to the statistical evidence, I thought you said that was at the heart of your claim. I'm a little confused about exactly what your intentional discrimination claim is. And let's just start with the fact that disparate impact is not an accepted doctrine under Title VI. Okay. We believe the centerpiece of our intentional discrimination claim is racial stereotyping. That is a form of intentional discrimination. As Your Honor pointed out in the Eastman Kodak case, that is because of race within the meaning of the Civil Rights Statutes and the Equal Protection Clause, whether it is unthinking or unknown, or whether it is simply misunderstanding the nature of a particular racial group's characteristics and generalizing about them. What is the evidence of racial profiling here? The evidence of racial stereotyping, Your Honor, comes in multiple forms. One, we have evidence from the Office of Civil Rights dating back all the way to the 1980s, in which Harvard was found to have engaged in these kinds of practices and they never took corrective action. Second, their own Office of Institutional Research found evidence of a penalty against Asian Americans in this personal rating. Third, and I think this is really important, Your Honor, after this litigation ensued, two important things happened. One, remarkably, the admissions rates for Asian Americans jumped dramatically right on the heels of filing of this lawsuit after it had been stagnant for nearly a decade. But even more important, it came out during trial that Harvard, for the first time in decades, altered its own procedures to account, as Dean McGrath said in her own testimony when she was recalled to the stand, out of concerns for stereotyping against Asian American applicants. If this were any other kind of civil rights case, if this were a Title VII case against an employer, and the argument was that women were denied promotion, not because of a lack of objective qualifications, but because they didn't fare as well on the subjective personal score, this case would have been resolved with summary judgment, let alone a trial. I think, is this general agreement that Arlington Heights framework is what's apical in this case? Am I correct? With respect, Your Honor, we disagree with that, and so did the District Court. Because Harvard uses a system of racial preferences, and because race can apply to any applicant, and you can find that on page 13 of the District Court's opinion, which is in the appendix. This case is no different than Fisher, in that respect. I was, excuse me a minute, because I am under a misapprehension. I was under the apprehension of the understanding that you had conceded that Arlington applied in the motion for summary judgment. We had relied on Arlington Heights in summary judgment because we were attempting to avoid a fact issue at trial, and we took the most onerous standard possible to try to avoid that fact issue. But we argued that at the close of trial, the strict scrutiny applies across the board. The District Court passed on that argument. Not only did it pass on it, it accepted it, and the argument is therefore before this court on appeal. And I would add, Your Honor, I think the Supreme Court has been clear that parties can't stipulate a way to standard a review, no more than they could under a Rule 12 versus a Rule 56 standard. It's for the court to decide. But we argued it below, and it's been preserved, and it's before this court. And, Your Honor, so when we go back to sort of the beginning, just so I can make sure we're all understanding our argument, the statistical evidence in this case showed that the personal rating discriminates against Asian Americans in a statistically significant way. So that's only if your expert's model is accepted, and the District Court actually found that Harvard's statistical model was the more reliable one. So, again, I'm just trying to get your argument, so proceed, please. With respect, Your Honor, I think what the District Court found was it created its own two preferred models. It accepted most of the assumptions of Harvard's expert, and for purposes of appeal, we are willing to accept that with one issue, which is the inclusion of the personal rating. And what the District Court found was that both models, the one with the personal rating and the one without it, were credible and probative and should be deemed as evidence about Harvard's admissions system. And once strict scrutiny applies, Harvard is in big trouble, because Harvard bears the burden of disproving discrimination. I'm sorry, but I think we circled back around to my, if there is no intentional discrimination, why does strict scrutiny apply? I think the standard of review comes before how you measure the evidence. The first thing the court ought to do, in our respectful opinion, is determine what the appropriate standard of review is, and then measure the evidence against it. So once strict scrutiny applies, Harvard bears the burden of disabusing this court of the notion that there is intentional discrimination. So as the Supreme Court said in the Clayboy Enterprises case, when it was applying strict scrutiny, if the defendant can't dispel an inference or a concern about discrimination, when strict scrutiny applies, the defendant loses. They don't win when a district court in this case says they can't really satisfactorily explain why Asian Americans are faring so poorly in this personal rating. And Harvard has no explanation either. This is why the district court ultimately ended up speculating that there were innocent reasons that can't be found in the record, and tried to blame school support ratings and other evidence as the culprit for what's obvious from the record. The problem with that is the school support ratings are in the model, and this argument that the actual recommendation letters themselves are somehow the culprit is pure evidence-free speculation. They weren't reviewed, they weren't studied, they weren't admitted in a statistically significant way, and when we're talking about racial preferences, this is all wrong with respect. Harvard has to show that it's not discriminating, and it just failed to do so in this case. In addition to that, Your Honor, putting aside the claim of intentional discrimination against Asian Americans, there's a serious issue with race-neutral alternatives in this case. The district court has been clear that a university bears the burden of showing that there are no workable alternatives to the use of race. Here, the record is clear that Professor Kallenberg, our expert, showed that Harvard could increase overall racial diversity, increase socioeconomic diversity, and suffer no adverse consequences academically or in any other way by eliminating racial preferences, eliminating, excuse me, the legacy preferences, and giving a greater boost to socioeconomic diversity. We believe... Counsel, thank you for that, but can we go back to the question of the inclusion or exclusion of the personal rating? The district court held that regardless of whether the personal rating is included or not, the average marginal effect is close to zero, and that it varied by admission cycle, and it was not always negative in each admission cycle. So, I know that your overall position is one ought to be looking at this over a longer time span and not just year by year, but what do we do with the fact that there are different results in different years? So, Your Honor, we think the court should just look at the data the same way Harvard's own expert did, and that's not asking the court to pool the data the way our expert did and which the district court did not agree with. What Harvard's own expert did was look at the data and make what's called an average marginal effect across the six-year cycle, and the reason why you do that is because when you get into individual cycles, the data, and this is the word of experts, becomes noisy because the variables are extensive, but the data inputs get smaller, and when you look at the average marginal effect here, it is statistically significant. No, I believe that varied year by year as well, and that there were, she also found that there were, the difference in magnitude was small and that unobservable factors captured by the personal rating, not discrimination, could explain this. So, what is your response to that? Taking the second first, the unobservable point is the point Your Honor I was making earlier. Yes, but that depends on us accepting that Harvard was under strict scrutiny and it bore the burden of proof. Even putting strict scrutiny aside, Your Honor, and let's assume that we bear the burden of preponderance here. The answer really is the same. When the district court talked about unobservable factors, the district court couldn't have been talking about the school support ratings because they're in the model. What the district court then speculated about was not the ratings themselves that were quote-unquote unobserved, but the actual content of those letters. The district court essentially funneled into one unobserved factor an entire theory of discrimination and causal effect that isn't in the record. I would ask Harvard to point to the record where there was any examination systematically of the underlying content of these recommendation letters. In fact, Harvard's own expert testified about none of them, and I believe the record shows he only reviewed five files. So, whether this is preponderance or strict scrutiny, this is still a lack of evidence to overcome the statistical finding. And at the end of the day, Your Honor, I guess I would step back. I believe my time has expired or is about to, but I would just sum in this way, Your Honor, if the court just takes the district court's record as it finds it and asks itself, can we be confident that Harvard is not discriminating against Asian American applicants in the way the Supreme Court asks us to be confident that we're going to allow these universities to use racial preferences? I believe the answer is a resounding no. And if the district court had that confidence, there would not have been the kind of hand wringing that we find throughout this entire opinion. Counsel, if I may, you started out by saying that the Harvard system is intentionally discriminatory because it uses subjective criteria. And I assume you would say the personal rating is a prime example of subjective criteria. But in the Bakke case, which, of course, binds us, they also use subjective criteria and talked glowingly of Harvard's plan at the time. And so you seem to be arguing that you cannot use subjective criteria at all. Have I misunderstood? With respect, I think you have, Your Honor. Chief Judge Howard, may I answer? Yes, of course. Thank you. So we are not arguing that Harvard's system is discriminatory because it uses subjective criteria. We are saying it is more susceptible to stereotyping and bias infiltrating its system because it uses subjective criteria. I think that's not only true from the case law. I think that's just common sense. If this were an employment case and a group of applicants were better on all the objective criteria, say it were African-American police officers, for example, from some of the Boston cases this court has had, and the only area where they were trailing was the one place that looked at personal qualities with subjective criteria, I think the court would be skeptical and concerned that this was discrimination and not that African-American firefighters or police officers actually had worse personal qualities. They were less effervescent. Thank you, counsel. All right. Thank you. We'll hear from Mr. Driven. Good afternoon, Your Honor. Good afternoon. May it please the court. My name is Eric Driven, and I represent the United States at the linkage to your item in this case. The record here reflects at least two reasons why this court should reverse the district court. First, Harvard engaged in unlawful racial balancing in college admissions. And second, Harvard's race discrimination unduly burdened its Asian-American applicants relative to white and other applicants to Harvard College. First, on the question of racial balancing, because Harvard admits that it uses race in its admissions process, strict scrutiny applies, and Harvard bears the burden of demonstrating that its use of race is narrowly tailored. In fact, in this case... Mr. Driven, that is a distinct argument. In your view, is that the same as the intentional discrimination argument? Your Honor, no. It is a different claim by the... Right. That's the way I understand it. I'm sorry. Proceed. So, because Harvard bears the burden, it has to show that its use of race is narrowly tailored. And what we see, what the record reflects in this case, is that Harvard's use of race is quite, in fact, expansive. Harvard monitors the evolving composition of the class at every stage of the process. The application summer sheets given to Harvard admissions officers includes race. First readers use race. Second readers use race. Subcommittees use race. The committee, the Harvard admissions committee uses race. The lopping process at the end of the process uses race. Harvard admits that the overall rating it assigns to each applicant considers and uses race. And Harvard monitors the class as it evolves throughout the system by comparing the evolving racial composition of the class to the prior year's racial composition. And so what we see is a class that year over year is racially balanced within a very narrow range as well. But look at the constant attention to the racial makeup I thought was specifically blessed in Grutter. University of Michigan Law School would frequently consult the daily reports that kept track of that data, racial and ethnic composition. Yes, your honor. And in Grutter, the law school did pay attention to the numbers. They had these daily reports that monitor them. But there was no indication in Grutter that the law school at the University of Michigan was using their tracking or their monitoring of paying some attention to numbers by comparing it to the prior year. What we have here is, unlike Grutter, is we have a constant monitoring through Harvard's process of the racial composition of the class comparing it to the prior year in order to keep the racial composition of the class within a very narrow range. And so what the data show by way of example, in addition to a much more narrow range of an outcome here on the order of 2.7 percentage points over a multi-year period, whereas in Grutter it was a much broader range, we have in this case a narrow range of the favored minority groups that issue. We also have data that shows for a 40-year period, without exception, Asian American applicants in every single year from 1980 to 2019 were admitted at a percentage lower than their percentage in the applicant pool. That is not the case in any way in Grutter. In addition, what we have here is evidence directly from Harvard's Smith Committee when they considered, as a result, look at race-neutral alternatives, whether or not they could utilize race-neutral alternatives. And what that committee concluded was that none were acceptable because Harvard wants to maintain the level of diversity that it has and has experienced in prior years. In other words, Harvard wants to continue to balance the class based on race. Indeed, the dean of the college— Mr. Drudman, may I ask you a question? I read your brief. You were arguing that Grutter requires the court to consider whether Asian Americans were disfavored, not with respect to whites, which is what I understand the plaintiffs to be arguing, but with respect to African American and or Hispanic applicants. If you are making that argument, that is not an argument presented by the plaintiffs in this case. And what entitles the United States to present a different case to us than that presented by the plaintiffs? Your Honor, I do not believe we are making a different argument. Certainly, part of the argument the plaintiffs are making here, especially with respect to the personal rating, is that the personal rating disadvantages Asian American applicants relative to white applicants. Certainly, we acknowledge that. That is part of the claim. But there is nothing here to suggest that that is the only limit. And certainly, Mr. Consovoy can speak to his claim. But we understand the claim to be that Asian American applicants are unduly burdened by the expansive and pervasive use of race by Harvard. That entails a look at the full spectrum of what is going on here. What we see, for example, Your Honor, right out of Harvard's own expert, is an acknowledgement that Asian American applicants are being penalized at a rate from their own expert, Dr. Hart, of 11.1% relative to other racial groups. At the same time, we see the use of racial tips being used with other racial minority groups, but not with respect to Asian Americans. And so overall, then, in addition, you have 40 years of data, as I said, in which Asian American applicants year over year over year are being admitted at a rate lower, lower than their presence in the applicant pool. And that is completely unlike anything that was issued, for example, in the Glutter case, where the admissions numbers were very different than that, where all racial groups, including Asians, were admitted at lower numbers. It's different than what we saw in the Supreme Court's decision in Fisher, where the majority opinion said there was no indication of discrimination against Asian American applicants by the University of Texas. Instead, here, what we see are tips to other racial groups. We see that favors them in admissions. We see a corresponding reduction in the number of Asian Americans who are being admitted to Harvard College year over year. And as Mr. Consovoy said, we have the very suspicious and entirely subjective use of personal rating, in which Harvard admissions offices are sitting in their offices, assigning ratings based on criteria like courage and integrity. And somehow, in some mysterious, unexplained way, in every year over the six-year data period we have here, the Asian American applicants are being rated as having less courage and less integrity, despite the fact that they are, by the other metrics, academic performance and extracurriculars, the highest. Mr. Driban, if you're interested in accomplishing diversity in a way which is consistent with the use of race, and at least thus far, the Supreme Court has said that this is acceptable, your argument seems to come down to Harvard must admit based only on academic rating and may not consider anything else. So, can we go back to the law? Harvard can, in fact, consider other things than merely class ranking and the academic achievements of the Asian American applicants, correct? Yes. And I think, Your Honor, I think the University of Texas case involving the Fisher plaintiff is instructive. In that case, the University of Texas considered race as one factor of a sub-factor of a multi-factor test and decisions were made by admissions officers who did not know the race of the applicants. In addition, race was only considered for about a quarter of the applicant pool. 75% of the applicants were admitted based on a race-neutral process. So, what the Supreme Court has said in Fisher is that certainly universities in higher education can consider race in a narrow way, but universities, when they do that, are subject to strict scrutiny. And so, what we have here, unlike what we have in the Fisher case, is an expansive, pervasive use of race that disadvantages Asian American applicants to Harvard College. That is very different. And nothing in Fisher 2 says you can only use race once in the admission process and then at the very end. But the way I read your brief, you seem to be presenting that argument to us. Today, instead, you are presenting an argument that, oh, they considered it too many times. Is this a numeric thing? The district court rejected your argument that when they considered it at various times in the process, that that was, in fact, proof of racial balancing. So, are you arguing for some sort of per se rule? You can consider race twice in the process? And where in the law would you find that limitation? Well, my argument today is the same as it is in our brief, which is that Harvard engaged in unlawful racial balancing. And the evidence of the racial balancing consists of the fact that Harvard continually used race at multiple steps of the process. Frankly, every step of the process, Harvard insists upon maintaining the same level of diversity, i.e., the racial balance. Fisher, the district court decision in Fisher 2, the most recent pronouncement we have from the court, directed universities and colleges to use race if they want to. They're permitted to do it, but they're permitted to do it in a very narrow way. And they're subject to scrutiny. Okay. This is now a different argument that they haven't narrowly tailored it enough. Regardless of whether there's racial balance, I take it you would say that it had to be narrowly tailored. And independently, it is not narrowly tailored here. Is that correct? That's correct, Your Honor. Okay. But it's not narrowly tailored. And in addition to the fact that it just pervades every aspect of the process in this case, what we have is, the result of that is the racial balancing that I mentioned. Harvard put on evidence accepted by the district court as the narrow tailoring and consideration of other alternatives. And it considered the model put forth by the plaintiffs and concluded, if that were used, there would be a very sharp decline in the number of African American and Hispanic students who were admitted. That's what the record shows. So, in light of that, why isn't Harvard's rejection of those other alternatives sufficient to show that what they have done is narrowly tailored? You have to have alternatives. Yes, Your Honor. Because, Your Honor, sorry. I'll defer to Mr. Consovoy about the testimony about race-control alternatives. What is happening here, though, are two things. One is that we have Harvard using race pervasively and, frankly, saturating its entire process. And Harvard is doing it in order to maintain a racial composition of the class that balances the class out within every year, year over year over year. And at the same time, though, it is injuring Asian American applicants to Harvard College because they are being admitted in numbers below which they would otherwise be admitted. Now, with respect to the court's question about lowering of other racial minority groups, there are other ways that Harvard could do it. The University of Texas, for example, came up with a process that certainly satisfied the compelling interest that the University of Texas had in the Fisher case. And they used race in a narrow way, much more narrow than is at issue here. They did it in a manner that the majority said did not injure Asian American applicants, and there was no evidence in the majority opinion of racial balancing. Harvard could certainly adopt something of that sort or at least endeavor to do it. Instead, what we have here is no serious effort at race-neutral alternatives until this litigation and then rejecting them because, as Harvard says, Harvard insists upon maintaining the level of diversity that it wants to have year over year, which is essentially to continue racially balancing the class. And I would add, I think the time is about up, Your Honor, that I think we have to remember here that the use of race is an exception to the usual prohibition of the use of race at all. The Supreme Court taught us more than 75 years ago the use of race is odious to a free people. And the Supreme Court has acknowledged that for a limited period of time in a narrow way, institutions may use race lawfully, but that's not what we have going on here. What we have here is an attempt by Harvard College to enshrine internally the use of race and to do it in a way that balances the class and that injures Asian American applicants. Thank you, Mr. Driven. We'll hear from the other side. Mr. Waxman? Can the court hear me?  See me? Excellent. Thank you. May it please the court. I think I will try to focus my 20 minutes on three points that on which SFFA seemed to focus. The issue in the case that they articulated at the outset is discrimination, intentional discrimination of the personal rating. Secondly, the relevant burden of proof, who bears it and what it is with respect to count discrimination. As to counts two, three, and four, these are counts that are challenging our compliance with Grutter, Fisher, and Bakke. We acknowledge that we bear the burden of proving by strict scrutiny, both a compelling interest and a narrowly tailored program. And third, I'd like to talk about this notion of stereotyping and implicit bias. And I hope I'll be able to get to all of them. If I do, I'll address the Grutter and Fisher points that Mr. Dryband issued. And of course, I really am principally here to answer any questions that the court has. I mean, the one thing that is remarkable about this case is that the trial court heard the testimony of 25 witnesses. She reviewed hundreds in detail, hundreds of exhibits, and she issued 80 pages of detailed findings of fact that explain why Harvard does not intentionally discriminate against Asian-Americans, regardless of what burden is placed on whom, and also explain why Harvard admissions policies line up exactly with the requirements that the Supreme Court has articulated for consideration of race. Now, as to taking first the issue of burden, the question of burden in this case didn't exist in this, didn't exist at all throughout all the pretrial proceedings, through the government's opening statement, through the government's closing argument. It is now in its post-trial briefing on appeal, arguing so far as I can tell out of whole cloth that because Harvard accords a tip for some very highly qualified applicants from underrepresented minorities, which includes, by the way, many Asian-American ethnicities, that that somehow means that the claim that vis-a-vis whites, Harvard is intentionally discriminating against Asian-American applicants, Harvard bears the burden of proving that it is not intentionally discriminating. Count one— Mr. Axman, if I may, I questioned your two-brother counsel on this point. You have conceded strict scrutiny applies to the Grutter, Bakke, those sorts of—but the district court, in the opinion, in a sort of free-floating sentence, seems to assume that strict scrutiny applies to the intentional discrimination claim. And I have not quite understood why that should be so. And indeed, I believe Judge Torea's earlier question went to a similar point. So you would say they have to show intentional discrimination before they get the advantage of strict scrutiny as to that point. Is that correct? Yes. They have to show, on count one, alleging intentional discrimination against Asian-Americans vis-a-vis whites, number one, that there is, in fact, disparate treatment of Asian-Americans vis-a-vis whites, and if so, that it results from, quote, purposeful discrimination. It is plainly their burden to establish those two predicates. The district court found, on the basis of a mountain of evidence, that they didn't establish either, and that's why the court found that it really doesn't matter whether you then put a burden on Harvard to provide an explanation under strict scrutiny or not. The court found that we prevailed either way. I think, and I agree with your honor, I have read and re-read the district court's opinion on this many, many times, and I'm not sure I really understand what her reasoning is. I think what she was saying is that with respect to counts two, three, and four, under the strict, an element of narrow tailoring, when considering a program of using race as a plus factor to promote diversity, one of the things that the defendant has to prove is that using a plus factor for some members of some underrepresented minorities does not, quote, unduly harm any members of the racial and ethnic groups that do not receive the benefit of that. And the test we know from Grutter is, for undue harm, is whether a school, quote, uses race as a plus factor in the context of individualized consideration. If so, the court continued, a rejected applicant will not have been foreclosed from all consideration for that seat simply because he was not the right color or used the wrong surname, and the district court found, as the evidence compelled the conclusion, that Harvard, in fact, has an individualized process, and this goes also to the government's argument about using race as more than a plus factor, in which, as the court found and the evidence showed, every candidate is evaluated on the basis of the full application and all the applicant is competing for every seat in Harvard's 1600 seat class in every instance. And so I think what the court basically did was to say, I'm applying the undue burden standard. I'm also going to look at the personal rating, which I find is not evidence of discrimination. I think that step was wrong because the dispute about the personal rating goes only to count one, and I do want to say, you know, perhaps more than you want to hear about the personal rating, but let me first just dispense with this notion that, you know, that my brother Mr. Consovoy said, which is this case was always about racial stereotyping, and we've heard an incessant amount in their briefs about the fact that what really went on here was implicit bias, that implicit bias was really at work, and that's what Professor Arcidiacono found. Let's be very clear about this. The whole notion of implicit bias, not a single witness, SSFA didn't question a single fact witness, didn't present a single fact witness who testified at all about implicit bias. They didn't put on an expert who would testify about what do we mean by implicit bias in this context, and why is it reasonable to conclude that it's infecting the process insofar as there was testimony about it. I mean, this is something that their lawyers started coming up with in the very last week of trial after it turned out that, although they proclaimed in their opening statement that they were going to call Harvard witnesses who would acknowledge that they were using, that they were essentially putting a thumb on the scale against Asian American applicants, and none of that transpired. We started hearing in the days leading up to the closing argument that this is just implicit bias at work. There is no evidence in the case to support that, and the evidence was directly to the contrary. I would point that out. May I, may I please? I'm sorry. In Title VII law, there has been some recognition of what's called the cat's paw theory, which is, let's say, the high school guidance counselors whose recommendations go very much to the personal rating. If Harvard knew there was systemic bias in those guidance counselors and nonetheless just sort of automatically adopted those stereotypical views, would Harvard be chargeable with that? Now, I know the district court said there is no such evidence, and I don't find that Harvard admission officers themselves contained any implicit bias, but your brother does suggest something to this effect. Yes, I was actually somewhat dismayed to hear that suggestion. I mean, as to your district judge found that it was not true in finding that she credited the testimony of every admissions officer that they had never engaged in or seen any evidence of racial bias, implicit or explicit, and we're talking, after all, I mean, I think it's useful to put the personal rating in context here. Every single applicant candidacy is decided following an en banc meeting of 40 admissions officers and invited faculty who are looking not at what a first reader of the new file puts down as a personal rating or an academic rating as a form of triage to determine out of the 40,000 applications, which are the 30,000 we should actually be talking about. The testimony was unanimous that what they are doing is they have the whole file in front of them. They all listen to each other's comments. They read all of the essays, the personal statements, the letters of recommendation, the narrative analyses of the either alumni interviewers or the staff interviews who interview the kids and the narratives of the recommendations provided by the guidance counselor and the teacher, and so the only way any of that would be if it existed, the only way any of that would be relevant if, in fact, it had a statistically significant effect on admissions outcomes, which the court found even taking Professor Arcidiacono's extraordinarily weak model without the personal rating. Nonetheless, she found that just looking at the statistical evidence alone, quote, the model doesn't demonstrate any intent by admissions officers to discriminate based on racial identity. Now, my friend on the other side challenged me to identify someplace in the record where there was a basis to conclude that the school support ratings, in fact, demonstrated a differential evaluation of the many non-academic factors that Harvard ignores, that Harvard considers heavily in the process. Professor Card did exactly that, and the district court recognized it at page 6082 of the record. He shows what he did is he looked at school support ratings, the numerical school support rating, separated out by the academic rating. In other words, what was the school support rating for applicants of similar academic ability and found, and it's demonstrated here, that at every single level, for whatever reason, white applicants scored better than Asian American applicants. And the notion advanced by my friend on the other side that none of this matters because the school support rating is part of the model is a non sequitur. What the admissions committee is looking at is not the first reader's evaluation of the school support ratings. It's looking at the narratives that the teachers and the guidance counselors and the many other people who write letters of recommendation attesting to the character of applicants are actually saying. There's nothing about the number that's initially assigned that bears on that in any way. I just wanted to ask you, what is the alleged evidence of stereotyping? Well, what Mr. Consovoy said at the outset was, well, the Office of Civil Rights found it. The Office of Institutional Research found it. The admissions rates for Asian Americans jumped dramatically in 2019, and there was post-conduct activity that proved it. The district court made specific findings with respect to each of those allegations, and she found that not a single one of them was true. The Office of Civil Rights, just for example, found that, looking for it, and I'm quoting from page 4520 of the Joint Appendix, it was the Office of Civil Rights overall conclusion that Harvard did not discriminate against Asian American applicants in its undergraduate program in violation of Title VI. In fact, thinking about the personal rating, I do want to save time to talk about this one particular issue which in this appeal has assumed a Frankenstein-like significance. I want to make a couple of points about this, but the first thing I think that's worth mentioning is that this very thing that is a disparity in the personal ratings allocated by first readers was examined. The OCR itself found that numerical disparity. It reached the exact same conclusion based on its review of all the evidence that Judge Burroughs did. The reason it reached that conclusion is that where the instances and applications were in a large representative sample of applications, OCR actually pulled the application files and read it and made a specific conclusion that the ratings accorded by the first reader, in fact, were well supported by the application file. It specifically found that although there was a variation, there was an association that looked like it was with race. In fact, race was not the factor. The same must be true here. SFFA had access to 480 full application files, 320 of them it hand-selected. It never offered a single application file that reflected or even argued reflected a personal rating that it claimed reflected bias or discrimination. The judge, in this case, just like OCR had to do, was confronted with a regression model, about which I can say quite a lot, that Professor Arsidiakono did of the academic rating, the extracurricular rating, and the personal rating, all of which showed a race and association between African American identity and white identity. With respect to the academic rating and the extracurricular rating, Professor Arsidiakono's model showed that even controlling for all of the objective data about academic performance, Asian Americans were scoring significantly higher than whites. He didn't know why because it was due to factors that the limited data that's available in the model doesn't reflect. For example, did the kid win the National Science Award? Did she publish original research that was reviewed by the faculty who fell head over heels in love with her? Similarly, the extracurricular rating. As to the personal rating, he found, as we now know, a slight negative association, just as OCR had found. The district court had to make a judgment. She said, I have to find whether that slight negative association warrants an inference of intentional discrimination. She found that it didn't. One of the things I think, she doesn't actually quote this in her opinion, but we asked Professor Arsidiakono about this at trial. Here's what he said at page 2372 of the record, I am confused about what is in the personal rating. The notion that this man had the chutzpah to then say, I'm confused about what's in it, but I know that it's purposeful discrimination is really beyond the pale. I do think in this regard, and I don't mean to be preaching to the whether there was or wasn't an inference of purposeful discrimination based on what one reader or most two readers at an early stage of the process wrote down for the personal rating. The issue is, was there discrimination, intentional discrimination against Asian American applicants in the admissions process? A process that doesn't even in evaluating these students in committee, doesn't even take account of what somebody or one of 40 admissions officers early on put down as the athletic rating, the academic rating or any such thing. Mr. Waxman, before you wrap up, this is our only chance to talk with counsel. I did want to ask whether you would talk a little bit about yield and yield rates and the role that plays in this case. On the one hand, an institution is seeking a diverse student body and a diverse community. On the other hand, there is a real concern about improper balancing. Could you talk about the appropriateness or inappropriateness of factoring in yield rates and what that means in this case? I think yield rates can mean different things, but let me explain to your honor what the statistics were that were discussed and were found by the district court. If your honor means something else, I'll address it. In evaluating the racial balancing claim, and here, SFFA's own expert didn't provide any testimony in support of the theory that there was racial balancing. The district court looked at a number of things. It looked at, and it's in the histogram that has that bar chart. I'm forgetting what page of the opinion. It's around page 80 or 81. It found that the variation in admission rates of Asian Americans, African Americans, Hispanics, and whites vary dramatically from year to year. She also looked at the year-over-year change in the percentage of each matriculating class and admitted class based on race. She also made a comment, and this may be your honor's question, about the fact that overall, Asian Americans are admitted at a slightly lower rate than white applicants, although she also found, and the data is right there in the record, that for those applicants who are what the court and counsel referred to as the ALDCs, which is an acronym that was made up in this litigation, Asian Americans were admitted at a higher rate than whites. She also found, based on a chart that SFFA prepared, which is at page 6007 of the joint appendix, that among non-ALDC applicants, which is Professor Arcidiakouna's baseline data set, in four out of the six years, Asian Americans were admitted at a higher rate than whites. She also found, as Professor Card showed, that female Asian Americans are admitted at a higher rate than whites. Asians from California are admitted at a higher rate than whites. The reason for the overall distinction is during the years studied, Asian Americans made up a relatively small share of the 30% of students admitted who are ALDCs. Now, that number, that 13% by the last year of the study, but what she found was even taking their favorite metric, they have artificially selected a year range, I think it's 2010 to 2018, and said you would look at the percentage of Asian Americans and African Americans and Hispanics in the class and there their own metric. One can only imagine how they came up with that specific year range, but over that year range alone, the African American percentage of the class varied by 17%, the Hispanic percentage of the class varied by 40%, the Asian American percentage of the class varied by 16%. Just to put some meat on the bones of these statistics, the latter is the difference between an average admitted class of 2000, the difference between 350 admitted Asian Americans and 406 admitted Asian Americans. At trial, the plaintiff claimed and Mr. Consovoy repeated it today, that the evidence here is that there was some dramatic increase in 2019, which was the class that was admitted just after this lawsuit was filed. With all due respect, that is like the rooster taking credit for the dawn, but just looking at the years leading up to the district court's opinion, Asian American admit rates as a percentage of the admitted and matriculating class hit a high in 2004, 2007, 2010, and 2012. I don't have any other speech to do, I do want to respond to any other questions that the court might have. Judge Howard, may I ask a question, please? Yes, of course. Those of us familiar with the case know what ALDC is, even if it's something coined for the case, and as I understand, it's people who get in on athletic prowess, legacy, they're children of faculty members, and then the dean may have a special list of people for whom there are special reasons to admit them. That's fully, roughly 30% of the class every single year, is that correct? I don't know that there was testimony that, it's not 30% every year, but 30% was used as sort of a rough average for the years that were studied. Now, I just want to correct a few predicates in your honor's question. These are not people who get in for that reason, these are applicants who have one of those four characteristics. The testimony in the case, everybody acknowledged, was that this pool, these people are not getting in. I mean, the determinative factor is that they're not that they're a son or daughter of a Harvard faculty member. That is one factor, they get a tip, but the testimony... They do get a bit of a preference if they are in one of these categories. It doesn't direct the admission, but they are advantaged by being in such a category. Yes, just as students who get an academic rating of one, or a personal rating of one, or happen to be from an underrepresented minority, get a tip that benefits them only if they are otherwise extraordinarily well qualified on all other levels. Thank you, sir. Good afternoon. May it please the court. David Hinojosa with the Lawyers Committee for Civil Rights Under Law on behalf of Student Amici. Student Amici are a multiracial group of Latinx, Asian American, Black, and Native American prospective and current students and alumni who originally sought to intervene in this case. Student Amici fully understand that race-conscious admissions programs like Harvard's remain a vital tool for selective universities in pursuing the educational benefits that flow from a diverse student body, and they also help ensure remarkable, well-rounded, underrepresented students of color are not overlooked in the admissions process. I'd like to discuss two points here today. First, I would like to focus on how Harvard's plus factor operates here, and also how the overall narrow tailoring framework functions. But then I'd also like to discuss a little bit about the racial balancing piece that's been a subject of a couple of the questions here today. Now, I think it's important for the court to understand just how challenging the admissions process is at Harvard. It receives over 35,000 applications from highly competitive students from around the country. Its admissions officers have a tough job trying to weigh the different factors, experiences, and talents in each of those applications. Ninety-four percent of student applicants are rejected, including Black and Latinx students with high academic ratings, and among the six percent who are admitted include some White and Asian-American students in the middle and lower decimals. That is represented in document 415-1, and I mention that because that's very critical. That was one of those factors that the Grutter Court looked at at page 339 of its opinion in order to better understand exactly how this flexible, individualized process works. Now, the overwhelming evidence in this case, including hundreds of student files reviewed, all applications in the record shows that Harvard's admissions process is consistent with the 40 years plus of precedent, grounded in an individualized review that is narrowly tailored to achieve Harvard's compelling interest in student body diversity. I just want to give two quick examples of that. So, when Teng Diep, one of the student amici, applied to Harvard, he submitted an essay describing how he overcame bullying because of his language and accent. For about a year, he practiced speaking with a pencil in his mouth, between his teeth, just to improve his English-speaking skills. Now, Harvard's reviewers commented favorably on Teng's Vietnamese identity, and as well as his determination in overcoming the adversity, his embracement of his identity in high school, and eventually graduating valedictorian. Sarah Cole, another student amici, wrote in her essay about how she had become involved and engaged in youth violence following the death of a friend who was shot and killed. Through the Kansas City Youth Board, Sarah provided recommendations to the mayor to combat youth violence, and reviewers favorably recognized her initiative and significant ties to her career. Neither Sarah nor Teng had perfect SAT scores, but their file reviews reflect the careful balance and the difficult balance in weighing strong personal and academic qualities and experiences in assigning overall ratings that align perfectly with the type of individualized process demanded by Fisher and Bruder. But if SFFA is ultimately successful in a race-in-race from the admissions process, their applications would look markedly different as they and other students of color would not be able to fully convey their strengths and contributions. This is not what the courts intended with 40-plus years of case law. I do want to mention very briefly this notion about race having to be a subfactor of a factor and about how that interplays with the racial balance, and one, the court has never said that. In Bruder, that was not the factor, but that was approved. In Bakke, even though it wasn't directly an issue, Justice Powell at the time had not intended for there to be a very prescriptive way of considering race and a holistic factor, and I think that's definitely, so long as it is narrowly tailored to the compelling interest and it is necessary, that's where the courts find themselves. One last point on, and Chief Judge, if I may? Yes. So, one last point on racial balancing. The United States seems to suggest that looking at this year-to-year and not seeing much of a difference is what the courts are centering on, and that's what they're concerned about. If you look at the Bruder opinion, and the Bruder opinion in the district court at 137 F 2nd at 840 in that opinion, you will see the facts there, and these facts were disturbing to the dissenting opinion, ultimately, in Bruder. Facts about Fisher were disturbing to the dissenting opinion in Fisher, but those facts show in Bruder that there was a 13% of all the underrepresented students of color from year-to-year only varying within less than one percentage point collectively over a stretch of four to five straight years, and yet the court approved that, and the reason why the court approved that is because the touchstone of whether or not an admissions plan is unlawful is whether or not there's a fixed quota and whether or not the individualized process has been erased or infiltrated so as to cause that. Thank you, Your Honor. Thank you very much. If you would now mute, and we'll hear from Ms. Lee. Good afternoon, and may it please the court. My name is Jinhee Lee. I'm with the NAACP Legal Defense and Educational Fund, and we represent 26 Harvard student and alumni organizations, including 10 Asian American organizations, as amici in this case. These organizations, which collectively represent over 16,000 Black, Latinx, Asian American, Native American, and white students and alumni, stand united before this court in firm support of Harvard's race conscious admissions program because they know from their own personal experiences the vital importance of racial diversity in their Harvard education. I would first like to address SFFA's alternative, which the district court below found to be unworkable and inadequate, in significant part due to the dramatic one-third reduction of the Black student population at Harvard. Now, it is widely acknowledged that our broken K-12 educational system deprived qualified and hardworking Black students from accessing important educational opportunities that would otherwise bolster their college application. These are students who would unquestionably succeed at Harvard and would contribute to the educational benefits of diversity at Harvard. And yet, SFFA would have Black students, more than students in any other racial group, suffer the most from their preferred race neutral alternative. And it is especially remarkable for SFFA and the Department of Justice to suggest that race is relevant while our country is currently grappling with the dual crises of police violence and the COVID-19 pandemic, which has revealed systemic, pervasive, and long-standing discrimination in the Black community. Now, Mr. Consovoy overlooks the harm to Black students by citing to increased numbers of students in other racial groups. But that, of course, relies on a false presumption that students of one race is fungible with students of another race, and that they would contribute the same to the educational benefits of diversity. And that, of course, is contrary to the individualized assessment that is required in a holistic admissions process that has been endorsed by the Supreme Court for over 42 years. One student of color is not an appropriate substitute for another student of color, just like one Black student is not an appropriate substitute for simply another Black student. Rather, race should be considered in conjunction with the host of other factors that is in the student's application. And that is precisely what Harvard does in its holistic and individualized admissions process. The one-third reduction of qualified Black students at Harvard would also diminish, and this is an important point, it would diminish the diversity within the Black student population at Harvard. Madison Trice, a Black Harvard student, testified at trial about the importance of recognizing and understanding the rich diversity within the Black community, whether it's by religion, political views, socioeconomic status, national origin, and, of course, academic interests. And the District Court heard testimony about this diversity from another Harvard student, Cecilia Nunez, who identifies as both African-American and Mexican-American. And it's because of the diversity in Harvard's Black and Latinx communities that she was able to explore her biracial identity at Harvard much more so than her predominantly Mexican-American community at home. And this diversity also helped her academically in her Latin American studies major. But eliminating race-conscious admissions would not only harm Black students, it would prevent, for example, it would prevent Harvard from considering the unique contributions of Native American students living on a reservation. It would have disadvantaged Harvard student Catherine Ho, who centered all three of her college essays on her Vietnamese identity and heritage, which Harvard admissions officers looked upon favorably in direct contradiction to SSSA's claims. Chief Judge Howard, I am about to run out of time. I have one final point, if I may have an additional minute, perhaps. One minute. This is an important point, which I think is important for the Court to hear. Each and every one of the organizations that I represent condemn race discrimination against any person, and most certainly against Asian-Americans. But this case does not seek to eliminate bias against Asian-Americans as demonstrated by the remedy, the sole remedy that SSSA seeks, which is the complete elimination of race-conscious admissions and nothing more. And to illustrate this point, in Count 1, SSSA claims that Harvard discriminates against Asian-American students vis-a-vis white students. And yet, if Abigail Fisher had sued Harvard instead of the University of Texas, she would have sought the exact same remedy that SSSA seeks today. The District Court ruled in an exhaustive opinion that Harvard's race-conscious admissions process was lawful under 42 years of Supreme Court precedent. And to the amici organizations, race-conscious admissions at Harvard is not only lawful, but it is essential, which is why we urge this Court to affirm the District Court's ruling below. Thank you, Your Honor. Thank you, Ms. Lee. Mr. Consovoy, you've reserved some time. Thank you, Your Honor. May it please the Court. Chief Judge Howard, I'd like to begin with your question about yield. Thank you. Because with respect, Mr. Waxman answered a number of questions about racial balancing, but he didn't even begin to answer your question about yield, and it's an important question. What Harvard does at the outset of the year, and the District Court finding to this effect, is they set racial targets. And then at the end of the process, it's very important for Harvard that they don't miss them, because different races yield at different rates. African Americans accept at a lower rate, for example, than Asian Americans. Now, Harvard only has 1,600 beds. They can't miss those numbers, as Dean Fitzsimmons testified. They have a real problem if they end up with 2,000 acceptances instead of 1,600. But if they get the racial yield wrong, they miss those targets. So what they have to do is go back at the end of the process and rebalance the class, if necessary, if they've missed those racial targets. And as Mr. Drybin pointed out, none of this happens in Grutter or Fisher. This is the kind of excessive focus on racial numerical representation that no Supreme Court case has said is permissible. And so I do think this is among the strongest evidence of racial balancing that distinguishes this case from the previous Supreme Court cases. And in fact, Director McGrath testified, and I've never heard testimony like this in any other case, that their goal is to achieve the same numbers they achieved the year before. Now, we accept for purposes of, in this court, that Supreme Court has said you can have a forward looking concept of diversity, and you want to make sure you have enough representation. But no case has said that the goal is to balance it against the prior year's numbers. That's just patently unconstitutional, as the Supreme Court said in Grutter and parents involved. Now, on the issue of strict scrutiny, I want to make sure our opposition is clear. In Fisher too, there was a claim of Asian American discrimination. There was a debate that pages 2207 in the majority opinion, and then throughout Justice Alito's dissent, about whether Texas was using race in a way that discriminated against Asian Americans. At no point in that opinion did the Supreme Court even begin to suggest that that was not subject to strict scrutiny. Everyone accepted it. Now, Harvard says it uses race the same way that Texas does, meaning it can play a role in any applicant who checks that box on their application. In fact, the amicus presentation today confirms that. They pointed out that they believe there are certain Asian American applicants who bended from their race. So, I don't want to be overly simplistic, Judge Lynch, but to get to your question on this, let me just reduce it to a basic numerical equation. This is not representative of what's going on. Imagine being African American or Hispanic gets you a plus one as a tip. And imagine the evidence we think shows that being Asian gets you a minus one. Now, Harvard concedes that whether there's a plus one versus a zero is subject to strict scrutiny, but somehow whether there's a zero versus a minus one is not. That's not what Fisher too says. That's not what any case says. It's all subject to strict scrutiny once the program is not basically neutral on racial lines. Now, finally, I'm sorry my friend Mr. Waxman thinks that SFA's focus on the personal score and Asian American stereotyping is incessant. I'm sorry he feels that way. The Asian American members of our association don't. And let me explain why. On page 69 of the district court's opinion, it said, the court concludes that the data demonstrates a statistically significant and negative relationship between Asian American identity and the personal rating assigned by Harvard's admissions officers holding constant any reasonable set of observable characteristics. That's a finding of fact that must be accepted. Now, either Asian Americans have worse personalities and deserve lower personal scores or something is awry. It is one or the other. Now, Harvard tries to sidestep this problem by blaming the counselors and the teachers. But those ratings which are given by Harvard have only minor differences between white applicants and Asian American applicants that are not statistically significant. The alumni interviewers who actually meet Asian American applicants say they have better or on par personal qualities with white applicants. And no one looked at any recommendation or letter and said, oh, there is bias against Asian Americans here. It's Harvard who makes those ratings. It's Harvard who discriminated. And it's judgment against Harvard which had happened in this case. Thank you. If there are no questions from the panel, I'd like to thank counsel. We will take the difficult issues in this case under advisement. And we will get you a decision as soon as we can. Thank you all. Thank you, your honors. Thank you. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court.